AHOLA, by Guardian *ad litem,* and another, Appellants, v. SINCOCK, Respondent.*

*January 8—February 3, 1959.*

* Motion for rehearing denied, with $25 costs, on April 7, 1959.

For the appellants there were briefs by *Daniel I. D'Amico* of Cumberland, and *Harry T. Lathrop* of Duluth, Minnesota, and oral argument by *Mr. D'Amico*.

For the respondent there was a brief by *R. Charles Banker* and *Johnson, Fritschler, Barstow & Witkin,* all of Superior, and oral argument by *Mr. Banker* and *Mr. Barney B. Barstow.*

DIETERICH, J. The plaintiff was taken to St. Mary's Hospital in Superior, Wisconsin, and placed under the care

of Dr. H. A. Sincock, a specialist in diseases of children, gynecology, and obstetrics, on August 26, 1953. X rays were taken and the doctor found from physical examination "that she had a fracture, a portion of which was just protruding just beneath the skin about five inches below the hip joint itself, plus multiple slit superficial abrasions of the thigh. Mostly on the top surface of the thigh." Dr. Sincock testified as follows:

"*Q.* Where would you say this fracture occurred? *A.* I would say this fracture occurred, dividing the femur into thirds, that it was at the lower part of the upper third and the beginning part of the middle third."

The doctor stated that the child's leg was placed in Bryant's vertical traction which consists of a type of adhesive tape. The tape is sticky on one side and the other side is a plain ordinary surface. A sheet wadding of cottony material is used as padding. One strip of tape is used on both sides and a small wooden block or spreader is placed inside the tape in position on the bottom of the foot. The spreader is used so that the tape does not stick to the ankle. The tape is placed so that the two sticky sides come together from the edge of the block down to where the cotton wadding is, so there would be no part of the tape that would stick to the ankle. Gauze was used over the tape so that it will adhere to the calf of the leg. From the ankle to the knee, on the top surface there is a space left at least one inch wide. On the back of the leg from the ankle to the knee a space of one inch wide is left so that in no place is the tape overlapping. That is where the bandage touches the skin. A rope is put through the end of the spreader and put over a pulley, and weights are attached to the pulley to apply traction. This creates a direct pull to the leg. The leg is pulled straight up at a right angle to the bed rather than lengthwise to the body. Care must be given to the foot and the leg because it is necessary for the

blood to be pumped high up into the air. Splints were applied above the knee. On August 30, 1953, the splints were adjusted. The hospital records indicate in Dr. Sincock's handwriting that he readjusted the splints because of pain and slight cyanosis of the foot (a bluish tinge in the color of skin) due to the presence of excessive amounts of reduced hemoglobin (reduced oxygen) in capillaries. Hospital records in Dr. Sincock's handwriting show that a notation on August 27th, indicated that 16 pounds were used on the leg, and further read: "Removed five pounds, so now there is 11-pound pull." On August 30th, the record indicates a decrease to nine-pound pull and that the doctor readjusted the splint on account of pain and slight cyanosis of the foot. On September 1, 1953, there is a notation that toes were somewhat cyanotic and the splint was again readjusted. Dr. Sincock's own records for September 2d, show, "Splint removed on 9/2/53 at 6 p. m. on account of circulatory disturbance. Upon removing tape, found the hematoma involving about 10 inches of calf and pressure area over the patella [knee]." On September 2d, Dr. Picard looked at the leg and on September 3d, Dr. Finn was called in for consultation. On September 4, 1953, Dr. Houkom was called from Duluth. His findings were: Fracture just above the knee with moderate overriding, in addition there was necrosis of the skin, particularly between the knee and the ankle joint and considerable swelling and bleb formation present. The diagnosis indicated: "Fracture of the shaft of the left femur with circulatory disturbance to the skin. Treatment recommended: That a Kirschner wire be inserted into the distal end of the left tibia using a Kirschner bow traction on this leg from an overhead frame. This would facilitate the change in applications of dressings to the rest of the leg. Signed: S. S. Houkom."

The diagnosis and findings of Dr. Finn indicated: "Fracture of the left mid one-third femur. Maceration of skin from

knee to ankle with sloughing following crush injury from car wheel. . . . Fracture of the femur. 2d, maceration of the skin and underlying tissue left lower leg. Recommended treatment: Observation, Hot packs. Traction to the leg." Dr. Sincock made a summary of the history that is included as part of the hospital records dated October 26, 1953, which read: "Transverse and slightly oblique to the end of the proximal third of the left femur with abrasion to the thigh and a deep contusion to the patella and inner condyle of the femur. Complications: Sloughing of the skin and fatty structure of almost the entire left calf. Muscle structure and sloughing about the inner condyle and over the patella."

An operative record made by Dr. Houkom indicated, "Case No. 3162, Date September 5, 1953. Room, Pediatrics. Name Miss Janie Ahola. Address, Poplar, Wisconsin. Service of Dr. Sincock. Preoperative diagnosis: Fracture of the mid-third shaft of the left femur. Postoperative diagnosis: Fracture of the mid-third shaft of the left femur. Dr. Houkom is surgeon. Sister Alitaria as the anesthetist, Dr. Finn as the assistant, and Sister Roseanne as the instrument nurse. The type of anesthetic used was ethel chloride. The operation was a Kirschner wire in the left tibia. The operation began at 8 a. m. in the morning. Was closed at 8:45 in the morning." What was done: "Under general anesthesia a Kirschner wire was passed through the distal portion of the tibia above the epiphyseal plate. A Kirschner bow was then fastened to the wire. The leg suspended by vertical traction with enough weight to keep the left buttock off the bed. Signed: S. D. Houkom," and it says, "Immediate postoperative condition, hemorrhage, shock, etc., was satisfactory."

Dr. Sincock on cross-examination was asked:

"*Q*. Will you describe to the court and jury just the process that you used in applying that method? *A*. The Bryant extension, as you know it now, is an upright holding

the leg at right angles with a block of wood separating the tape that comes on either side. The tape is held with the bandage so as to conserve the heat of the body so that the adhesive will adhere to the skin. There is a rope that goes through this crossbar, up into a pulley. The pulley goes to the foot of the bed, down the side and where a weight is placed upon it. The amount of weight that is placed at the ends of it, of course, is judged entirely by one factor. You want to get the child—you want to get, or want to know that those muscles are under tension, but not too much. We have only one rule to follow there. Chatterton told you that this afternoon. When your child's buttocks are above the bed so that you can slip your hands under the buttocks. That is the criterion of the amount of weight you should use on a child, and that is what I did, and then following that, the child's leg was properly padded . . . so that we could apply splints.

"*Q*. Now, doctor, on the 27th of August, did you adjust any of the weights on the leg, or on the traction? *A*. Yes.

"*Q*. And what adjustments did you make? *A*. I took off one of those five-pound weights you saw.

"*Q*. And by, 'five-pound weights,' what do you mean? *A*. It would reduce that pull by three quarters of a pound.

"*Q*. And again are those weights, the weights that we have shown to be Exhibit A? *A*. They are.

"*Q*. Doctor, . . . I would like again to show you defendant's Exhibit A and ask you if there is any explanation for the words, 'five pounds,' on there? *A*. Yes. This is a weight from a beam scale. That is . . . when this weight is placed on the end of a beam, it will take five pounds to balance it over here. But the actual weight in itself is only three quarters of a pound. . . .

"*Q*. Dr. Sincock, did you make any diagnosis after the condition developed that you found on Janie Ahola's leg on September 3d of the cause of the trouble? *A*. I did. . . . I found an area of demarcation involving the calf of the leg. That was the diagnosis. . . . September 3d, the area of demarcation that Dr. Picard and I noticed the night before had broken open and had begun to slough. The cause of this sloughing was primarily . . . from an automobile weighing· 2,700 pounds running over the leg of a child four years old,

. . . the tire crushing the muscles and impairing the circulation at the time of the accident. . . .

"*Q*. Now on August 26, 1953, there were 16 pounds of weight-pull applied to this traction, is that right? . . . *A*. . . . No, that is not right . . . that wasn't actually 16 pounds.

"*Q*. The record is wrong? *A*. No, the record isn't wrong, because I fully realized when that was put on that the numbers on the weights tallied up to 16 pounds, but those weights were weights that had been gathered here and there. They did not have enough weights at that particular time. It was kind of a gathering in of many weights.

"*Q*. The total amounted to 16 pounds? *A*. No, the numbers on them totaled 16 and so that we might have some knowledge of the numbers we put down pounds. It could have been 11 pounds the same as it could have been 16 pounds.

"*Q*. What weight was applied? *A*. I don't know what weight was applied, but it is not done by weight, it is done by what you want to accomplish.

"*Q*. You answered the question. So you apply certain weight to accomplish certain things, don't you? *A*. No. No. Not in pounds, no. You put on enough weight so you will get the result that you like to attain.

"*Q*. Well the records show that on that date 16 pounds? *A*. But not necessarily was it 16 pounds.

"*Q*. Well let's look at Thursday, August 27th? *A*. Yes.

"*Q*. The record shows five pounds removed and you had 11 pounds pull? *A*. Yes. Still it might not have been. It might have been 12 pounds.

"*Q*. The record shows 11? *A*. The record shows, but that doesn't necessarily mean actual pounds.

"*Q*. What does it mean? *A*. It means you're accomplishing the factor you're trying to get.

"*Q*. Are you saying then that on that date you likewise don't know how many weights you replaced? *A*. On that date, yes, likewise the actual weight I cannot certify to.

"*Q*. On August 28th . . . the record indicates this weight was reduced to a seven-pound pull? *A*. Yes.

"*Q*. Again, you don't know? *A*. That's right.

"*Q*. That's correct on that date, is that it? *A*. No . . . because still we are trying to accomplish a certain purpose with the weights and you haven't asked that yet and you probably won't ask; you don't want to know.

"*Q*. I'll ask it right now? *A*. You put on weights so as to bring the buttocks on the side of the traction so that your hand will slip in between the hip and the sheets for the purpose of—so that the nurse can get in to change and take care of the bath, urination, and bowel movements and when that is done the traction is supposed to be the amount that is required."

Dr. Victor E. Ekblad, physician and surgeon of Superior, Wisconsin, testified that the first time he saw the plaintiff was three or four days following the injury, the second time he saw her was the first of October, and that possibly he saw her a third time. Dr. Ekblad stated that "she was in bed with overhead extension and her general condition seemed very good. The application of the extension was very good. There was no comment to make on the condition of that limb which was extended. It was very good. In fact, I would say the extension had been put on in a very competent way." Further questions and answers of the doctor follow:

"*Q*. Doctor. . . . *Is there a method for determining what is proper weight on a traction of this sort?* [Italics supplied.] *A*. Yes. . . . To figure or determine the proper weight is to figure the size of your child—the weight of your child as near as you can and put on enough weight so as to lift them off the bed, and that distance may vary from, oh, just—as thin as a pane or anything—no pressure, no pressure on it up to where you can slide your hand under it. In fact, if you have too much weight on there, you lift the patient up and the first thing that happens, your equipment will hit the pulley—the overhead pulley and you can't do any more about it. . . .

"*Q*. And in your opinion, based upon what you saw that day, was the treatment which Dr. Sincock was administering proper or improper, judged according to medical standards in this city? *A*. *I think that was a proper treatment*. In fact,

in children it is the treatment of choice. . . . [Italics supplied.]

"Q. And based upon what you saw at that time, do you have an opinion as to the cause of her disability? A. Yes, I have. . . . It is my opinion that at the time of the injury, that the blood vessels extending from the knee, . . . had been traumatized at the time of the injury."

On cross-examination the doctor testified:

"Q. You mean to say, doctor, that an injury above the knee could cause a circulatory disturbance below the knee? A. Yes . . . there was discoloration and bruises, abrasions, and ecchymosis around the knee."

Dr. Charles Picard of Superior, testified:

"Q. Doctor, did you have occasion to consult with Dr. Sincock with respect to the treatment of Janie Ahola? A. Yes. . . . It was at St. Mary's Hospital on the night of September 2, 1953.

"Q. And can you tell the jury what you found to be her condition at that time? A. As I recall, Dr. Sincock called me in to see the patient at that time and I think he had just removed the splint or the traction from the leg, and the leg was laid down on the bed and there was at that time, the tape was still applied as I recall on the side of the leg. There was beginning cyanosis or area of cyanosis on the posterior aspect of leg and the calf of the leg, and this extended probably in the vicinity of seven to ten inches, I think, and the artery on the posterior part of the leg, the dorsalis pedis artery was pulsating. There was a fairly good pulsation at that time. The foot was warm. The ankle was warm. The toes were warm. There was no definite cyanosis in the toes at that particular time. There was a question whether it probably, or whether there was some impairment of the circulation at that time. So contrasting the two feet, we thought possibly there might have been a slight difference in the feel—the temperature, but one would be unable to state definitely there was. . . .

"Q. And did you and Dr. Sincock consult with each other as to what further proper treatment might be? A. Yes . . .

the leg was left down that night and I think antibiotics was started and heat was applied to the leg. Sandbags were placed over to hold the leg in position. I don't believe very much heat was put on. I don't recall just exactly how much, but a small amount, I believe it was, in a heat cradle it was I believe.

"*Q.* Doctor, on that evening and at that time, the treatment that was then being administered, will you state whether or not, in your opinion, it was proper? *A. Yes, I think it was proper.*" (Italics supplied.)

Dr. Frank Bernard, a specialist in plastic and reconstructive surgery at University Hospitals, Madison, examined the plaintiff on November 7, 1953. In part Dr. Bernard testified as follows:

"*Q.* Now, after your examination of Janie Ahola, did you reach any conclusion with respect to the cause of the death of the tissue on her left, lower leg? *A.* No. I think that we know the possibilities of the cause, but as far as reaching any definite conclusion as to the exact cause, I think that perhaps would have to be reserved from someone that was not human—meaning God.

"*Q.* Now, in your diagnosis of her injury and in the treatment of her did you reach any conclusion as to whether this disability may have come from one or more sources? *A.* . . . . In an injury such as Janie had, in listening to the testimony given this morning, I have no idea, of course, the position of her leg when she was injured, and probably no one does. We don't know whether the car ran over her leg, whether it bent back against itself, or whether out straight or how.

"*Q.* Doctor, . . . do you have an opinion as to whether trauma may have caused this condition? *A.* . . . . the opinion is based on similar cases of traumatic injury, and that opinion would be this: That such *a traumatic injury can produce injury to the vascularity of the extremity or of the leg* that will produce late changes resulting in death of tissue, *not at the site of the injury,* but at other peripheral sites. In other words, sites that are *further away from the blood supply.*" (Italics supplied.)

On direct examination, Dr. Herman W. Wirka testified that he is an orthopedic surgeon at the University Hospitals, Madison, that he is a resident in the bone-joint service and is on the teaching staff of the medical school. The doctor was asked:

"*Q*. When and where did you see her? *A*. First time I saw her was when she was admitted to the plastic-surgery service in 1953. November, 1953, as a patient on plastic-surgery service at the University Hospitals and the orthopedic hospital . . . transferred to my service December 11, 1953.

"*Q*. Can you tell the court and jury what your diagnosis was? *A*. Well, this girl had, at the time we received her on our service and prior to that time, she had a fracture of the shaft of the femur. That is the fracture of the thigh bone, and she had a large soft tissue loss—loss of tissue in the calf skin and the fatty tissue underneath the skin and in some of the muscle tissue also in that area. She had been grafted by the plastic surgery prior to her referral to our service. This area was in the process of healing from grafting—by grafting rather. She came to our service because of a foot condition which she had as a result of this injury that she had received. She had an equinovarus—a pointing down of the foot and a turning in of the foot, and she came and was referred to us for the treatment of that condition. . . .

"*Q*. . . . did you have an opinion as to the cause of her disability? *A*. Well, it was my opinion that this was one of these unhappy experiences of what we call a 'road crush,' or 'friction injury,' or, 'run-over injury,' with a massive loss of soft tissue as a result of the destruction of this soft tissue by the actual force of the wheel running over the part. Now, these occur in two ways. In one way, they may be a completely open injury. In other words, the skin is torn and it is quite evident that there is damage to the skin and the fat underneath and what we call the 'connective tissue,' that bind the skin and the fat to the muscle area. That is quite obvious when you see the patient.

"The other classification in this type of injury is the 'undisclosed damage,' the 'concealed damage.' That same

destruction can occur to the tissue, but at the time it is observed and even for a long time afterward, it does not make itself manifest. The tissue is dead because of pressure, and friction and although it has the appearance of normal tissue and it takes anywhere from four to six days, sometimes a week before it manifests any evidence of death of tissue and destruction of tissue and that is what we call a 'run-over injury,' a 'concealed run-over injury,' that is not visible to the examiner's eye or anybody's eye at that particular time.

"That similar type of injury happens when a child gets its arm into a wringer. At times the arm is drawn into the wringer and you get the child's arm out and everything looks fine and the next thing you know, you have an area of dead tissue appearing. It is primarily due to a disruption—a tearing of the soft tissue away from the blood vessels that go to that part.

"Now, the skin dies and the fatty tissue dies because it is torn away from the underlying structure and it is torn away from the blood vessels. The deeper structures of the muscles may die if the force is great enough to penetrate deep enough. Then it may die from just like a grinding action or a pounding action as though you would pound a piece of beef, or pound any kind of meat which eventually would decompose because its blood supply has been disrupted. It is called a 'concealed injury,' simply because it is never found until later on.

"Unfortunately a cast may have been put on. Then the cast comes off and then you see a sloughing in the skin. Where the limb looked perfectly normal prior to the application of the cast or traction being applied and then the traction is taken off and you find you have a sloughed area.

"It is always a debate in anybody's mind whether it is a pressure problem—whether it is a result of a bandage, but *it is not a result of a bandage because a bandage produces pressure over bony prominences and not over soft tissue area.* [Italics supplied.]

"That is one of the differentiating factors about this type of an injury, and the end result, of course, is that it has to be grafted and in this particular situation we attempted to get the foot up into a good weight-bearing position, but

failed primarily because of the damage to the deeper blood vessels, and the minute that the foot was brought up to a right angle, the foot became cyanotic or blue—discolored and the manipulation was stopped. This was done under a general anesthetic. . . .

"This was done under orthopedic service. I was present at the time. This was done by our resident and we stopped the procedure right then and there simply because the blood vessels in that lower extremity had been damaged and they were not competent to take that manipulation at that particular time. They might have been later on, or might become so later on.

"Now, she was seen at repeated intervals subsequent to that on the orthopedic service, and she was seen by various members of the staff. She was seen in January of 1954, and in March, 1954. She was seen in October, 1954, and she was seen in November, 1955, and . . . last in September, 1956, and advised to return in June of 1957, but did not return to our hospital.

"Q. Now, doctor, with respect to Janie Ahola, did you have an opinion as to whether her type of injury was one of these 'concealed run-over injuries?' A. Yes, sir, I think it was.

"Q. Now, if it were a 'concealed run-over injury' such as you have described, is there any method known to medicine, within your knowledge, whereby that could be discovered? A. . . . Well, it is very difficult to discover such a thing ahead of time except by conjecture. If you recall, the injury here is in the lower—in the calf part, yet the fracture is in the femur. That is quite characteristic of that 'run-over injury,' . . .

"Q. And is it your opinion then that no amount of treatment that is ordinarily exercised by a physician in attending an injury of this sort could have discovered the deep-lying injury to the blood vessels at an early date? A. Well, I think that it is almost impossible to discover these injuries at times. Now, I think that it is possible to discover them at times, though I think it is most likely that you cannot discover a 'concealed injury.' That is the unfortunate thing about it. That is why it is given that name.

"*Q*. Assuming that a child four years old was put in a Bryant traction method and 16 pounds would be put on one leg, what would happen to the child? *A*. Well, if there were no countertraction, and by 'countertraction,' I mean something to hold the child on the bed, that 16 pounds would just take and—take that leg and the trunk and turn them right over in the bed and the leg would have gone up to the top of the bed. The patient would have been turned on its side by traction—16 pounds of traction on a four-year-old would pull the child up unless there was countertraction, and countertraction means that if there was something to fix her down. It would pull the child up to the top of the traction block or pulley and that would be—then it would stop there. The child would be suspended and probably the shoulders would still be on the bed and the trunk still on the bed in part, but it would—that is what 16 pounds would do if there weren't any countertraction.

"*Q. Doctor, is the Bryant vertical-traction method recognized as a proper treatment for the fractures of femurs in children of tender age? A. Yes—used extensively.*" (Italics supplied.)

Dr. Carl Chatterton, an orthopedic surgeon from St. Paul, testified on behalf of the plaintiff. A portion of his questions and answers follows:

"*Q*. What condition did you find her, doctor? *A*. Well, the examination showed her eyes react to light. She has no facial blemishes. She still has some baby teeth, rather poor condition. Her external ears were all right. She moves her neck normally. Nothing abnormal noticed in her abdomen, or chest. On measurement of her length of limbs, on the right side it measured from the anterior-interior spine—that is from the pelvis down to the ankle, 28⅛ inches—that would be 24⅛ inches. On the left side it measured 24¾ inches. Her thighs were about the same size. 13½ inches in circumference on the right and 13 on the left.

"She has a scar just above the left knee which is slightly adherent to the underlying structures approximately two inches long and inch and half wide. On the outer side of

her leg she has a terrific scar right down to the bone, six inches long, two and half inches wide.

"I thought apparently the peroneal muscles were apparently gone. On the inner side of leg, there was a scar where the wire had been passed through. Her ankle seemed to be practically stiff. There is a small scar on top of her ankle. The position of her foot was what they commonly call 'club foot'—equinovarus.

"*Q*. What does that mean . . . to a layman? *A*. Standing on your toes and walking on the outer side of your foot."

Dr. Chatterton further testified that he saw the plaintiff on August 14 and 15, 1957, at St. Luke's Hospital, in St. Paul, Minnesota. She had her foot straightened. On August 14 and 15, 1957, she was given an anesthetic. Her foot was manipulated with a certain type of wrench and put up in plaster-of-Paris cast in the correct position. Dr. Chatterton, in his testimony stated, "that the average concensus of opinion of the amount of weight that should be used for traction, either overhead traction or leg traction, is usually 10 per cent of the body weight, and if she weighed 36 pounds, that would be about three pounds and a half. If she had 16 pounds on, that was too much and that is what caused the damage to her leg."

Then in response to a further question the answer was: "I can't conceive how they could put on 16 pounds on a little girl's leg and put a bandage on it and put that much weight on without pulling the skin right off."

In response to a question on tape strip, the doctor said: "The tape strip should start at the ankle and usually in a Bryant traction you like, if you can, to get the tape just as high as you can on the leg. Even up as far as the fracture, because then you have your weights and pulley pulling on a normal surface—normal skin surface and not just a small skin surface such as apparently was in this case where it was impossible, I understand, to put the adhesive high

because of the hematoma. On the inside she had a scar over —or a bruise over her patella and abrasion above. Therefore, the doctor didn't use skin tape high and there it is just a question of judgment whether you would use skin tape or perhaps use wire through which would be better than either one because that doesn't interfere with the circulation at all. . . . It is my belief that it was impossible to put the adhesive above there. That is as far as you can go. If she had a big sore on her knee and marks up there, well and good. Now, if you put 16 pounds on that is damaging and that is my whole contention as far as this case is concerned, sir. I have nothing more to say. Nothing I have read or heard was wrong as to the care afterward. I have nothing more to say. My only thought was, or the whole sum and substance as far as I am concerned is that the *only thing I saw wrong was the fact I couldn't conceive how a doctor would put 16 pounds on a foot, or even 11 pounds, or nine pounds if the record shows.*" (Italics supplied.)

"*Q.* Upon the same hypothesis and having in mind the facts and circumstances I have just recited in the hypothetical question just put to you and in accordance with the degree of care I have previously outlined here, do you have an opinion as to what aftercare was required? *A.* Well, I have an opinion. *As far as I know, the aftercare was as it should have been.* . . . [Italics supplied.]

"*Q.* Now, doctor, you mentioned the Bryant traction method. In 1953, in your opinion, was that an accepted method of treating fractures of the femur? *A.* I think it is used all over the United States. I think it is going into disrepute. Some people have had trouble with it.

"*Q.* You mention the trouble had with the Bryant traction method. Are those troubles that they have had even where the care has been very proper by the attending physician? *A.* That is right. Because of the situation when the child's leg is put up in the air, the heart pumps the blood up

to the toes. That is quite a little, if you happen to be a little weak and not up to standards, that is quite a chore for your heart to pump the blood up there to the toes, and not so often damaging like this, but very often loss of a toe or gangrene of the toe, and even in one night, without any warning, and that is why not very many people use the adhesive traction with the Bryant traction or Bryant extension. They usually use a wire so they don't cut off any circulation in the leg.

"*Q. But in 1953, it was an accepted choice of method? A. Still is. Practically all the children's hospitals use it on the smaller children.*" (Italics supplied.)

There were no conflicts in the testimony of the expert witnesses. They all agree that Dr. H. A. Sincock had used such degree of care and skill as a competent physician usually exercises in the same or similar locality, under like, or similar circumstances, having regard to the advanced state of medical or surgical science with respect to the amount of weight he used in applying the Bryant's vertical traction. The doctors unanimously testified that the treatment in applying the Bryant's vertical traction was a recognized or proper one. The expert testimony failed to sustain any contention that the doctor was negligent in regard to the kind of care administered to the plaintiff, either before or after the operation. *Stenkowiczki v. Lytle* (1920), 171 Wis. 625, 177 N. W. 849.

In *Jaeger v. Stratton* (1920), 170 Wis. 579, 581, 176 N. W. 61, it was said:

"When a physician exercises that degree of care, diligence, judgment, and skill which physicians in good standing of the same school of medicine usually exercise in the same or similar localities under like or similar circumstances, having due regard to the advanced state of medical or surgical science at the time, he has discharged his legal duty to his patient. *Nelson v. Harrington,* 72 Wis. 591, 40 N. W. 228, and note in 1 L. R. A. 719; *Wurdemann v. Barnes,* 92 Wis. 206, 66 N. W. 111; *Marchand v. Bellin,* 158 Wis. 184, 147 N. W. 1033; *Hrubes v. Faber,* 163 Wis. 89, 157 N. W. 519."

In *Kuehnemann v. Boyd* (1927), 193 Wis. 588, 591, 214 N. W. 326, 215 N. W. 455, it was held:

"It was the defendant's duty to exercise that degree of care, diligence, judgment, and skill which physicians in good standing in the same school of medicine usually exercise in the same or similar localities under like or similar circumstances, having regard to the advanced state of medical or surgical science at the time he has discharged his legal duty to his patient. In order to hold him liable the burden is upon the plaintiff to show that he failed in the requisite degree of care and skill. That degree of care and skill can only be proved by the testimony of experts. Without such testimony the jury has no standard which enables it to determine whether the defendant failed to exercise the degree of care and skill required of him. *Krueger v. Chase,* 172 Wis. 163, 177 N. W. 510; *McGraw v. Kerr,* 23 Colo. App. 163, 128 Pac. 870; *Hunter v. Burroughs,* 123 Va. 113, 96 S. E. 360."

This case was tried upon the theory that there was an excessive amount of weight placed upon the child's leg when it was placed in Bryant's vertical traction.

Let us first consider whether questions 1 and 2 of the verdict were a proper form of question to be used in this case.

We have carefully reviewed the testimony of the expert medical witnesses and conclude that questions 1 and 2 were properly submitted to the jury for consideration.

The plaintiff having made no request in the trial court for instructions as to the doctrine of *res ipsa loquitur* or its application in this case, it cannot be considered here.

We are of the opinion that the verdict of the jury is amply supported by the evidence and no reversible error was committed, and that the judgment of the circuit court is affirmed.

*By the Court.*—Judgment affirmed.