McManus, Guardian *ad litem,* and another, Appellants, v. Donlin and another, Respondents.

*March 3—March 31, 1964.*

For the appellants there was a brief by *Jack McManus* and *J. Philip Elliott, Jr.*, both of Madison, and oral argument by *Mr. McManus.*

For the respondent Donlin there was a brief by *W. L. Jackman,* attorney, and *Hart, Kraege, Jackman & Wightman* of counsel, all of Madison, and oral argument by *W. L. Jackman.*

For the respondent Dollard there was a brief by *Beckwith & Hollern* of Madison, and oral argument by *D. V. W. Beckwith.*

CURRIE, C. J. Appellant plaintiffs contend that they are entitled to a new trial on the following grounds:

(1) The trial court erred in granting a nonsuit because there was sufficient evidence in the record to raise a jury issue with respect to both defendants being guilty of malpractice.

(2) The trial court erred in refusing to apply the doctrine of *res ipsa loquitur.*

(3) The trial court committed prejudicial error in certain of its rulings on evidence.

In passing on the first of these contentions we will consider separately, the evidence relating to each defendant which plaintiffs claim required the trial court to submit the case to the jury. In so reviewing the evidence, we are mindful of the rule that the evidence is to be viewed in the light most favorable to plaintiffs, giving them the benefit of all inferences that can reasonably be deduced therefrom. *United States Fidelity & Guaranty Co. v. Milwaukee & S. T. Corp.* (1962), 18 Wis. (2d) 1, 7, 117 N. W. (2d) 708; *Weihert v. Piccione* (1956), 273 Wis. 448, 450, 78 N. W. (2d) 757.

### Alleged Malpractice of Dr. Donlin.

Plaintiffs contend that the evidence discloses that Dr. Donlin was negligent in the following respects: (1) Failure to diagnose the burn as a third-degree burn; (2) failure to use antibiotics as prophylaxis against possible infection; (3) failure to provide around-the-clock care; and (4) failure to change dressings as often as necessary.

It is true that Dr. Donlin diagnosed Jimmy's burn as a second-degree burn while both Dr. Dollard and Dr. Bernard diagnosed it as a third-degree burn. The difference between a deep second-degree burn and a third-degree burn is that skin will regenerate over the burned area of the former while it will not in the case of a third-degree burn. Dr. Bernard testified that a second-degree burn may be converted into a third-degree burn by infection. Furthermore, the depth of a burn cannot be determined by the physician looking at it, so he would not know at once whether it was a deep second-degree burn or a third-degree burn. We find it unnecessary, however, to determine whether there was sufficient evidence for a jury to find that Dr. Donlin improperly diagnosed Jimmy's condition. An incorrect diagnosis is not actionable unless followed by improper treatment. *Hill v. Boughton*

(1941), 146 Fla. 505, 1 So. (2d) 610; *Willard v. Hutson* (1963), 234 Or. 148, 378 Pac. (2d) 966; *Skodje v. Hardy* (1955), 47 Wash. (2d) 557, 288 Pac. (2d) 471; 41 Am. Jur., Physicians and Surgeons, p. 210, sec. 92; 70 C. J. S., Physicians and Surgeons, p. 961, sec. 48 d. The evidence discloses no improper treatment on Dr. Donlin's part.

As to the use of antibiotics in treating the burn, Dr. Bernard, plaintiffs' expert medical witness, testified as follows: With respect to using antibiotics before any infection had manifested itself, this is a matter of personal opinion of physicians, some do and others do not. It takes considerable time before it can be determined whether skin will be regenerated over the burned area, and that during such time the treatment is the same for a third-degree burn as it would be for a second-degree burn. Sometimes it is a month or even six or eight weeks before a general practitioner in the Madison area will send a third-degree burn patient to a plastic surgeon for skin-grafting treatment. The method of treatment by Dr. Donlin, namely, an ointment with a closed type of dressing, as distinguished from an open treatment with no dressing, is one of the acceptable methods of treatment for third-degree burns.

The evidence further establishes that the wet or soaked dressing type of treatment is recommended when infection has already set in. It is this type of dressing which requires an application of solution every couple of hours that is commonly spoken of as around-the-clock care. As soon as infection did make its appearance, Dr. Donlin had Jimmy placed in a hospital and turned his care over to Dr. Dollard, a specialist. Plaintiffs rely on an answer given by Dr. Dollard on his adverse examination that it is good medical practice, under the standard prevailing in Dane county, to change dressings where the burn wound has been contaminated with pus. Dr. Donlin, however, did change the dress-

ing on May 4th. The next day Jimmy was admitted to St. Mary's Hospital, and Dr. Donlin's treatment then ended.

When a physician exercises that degree of care, judgment, and skill which physicians in good standing of the same school of medicine usually exercise in the same or similar localities under like or similar circumstances, having due regard to the advanced state of medical science at the time, he has discharged his legal duty to his patient. *Ahola v. Sincock* (1959), 6 Wis. (2d) 332, 348, 94 N. W. (2d) 566; *Kuehnemann v. Boyd* (1927), 193 Wis. 588, 591, 214 N. W. 326, 215 N. W. 455; *Jaeger v. Stratton* (1920), 170 Wis. 579, 581, 176 N. W. 61. Prior to our recent decision in *Fehrman v. Smirl* (1963), 20 Wis. (2d) 1, 121 N. W. (2d) 255, 122 N. W. (2d) 439, this degree of care and skill could only be proved by the testimony of experts. See last cited cases and *Krueger v. Chase* (1920), 172 Wis. 163, 177 N. W. 510. The *Fehrman Case* relaxed this rule in situations where medical or surgical errors are of such nature that any layman is competent to pass judgment thereon and conclude from common experience that such things do not happen if there has been proper skill and care. The instant case clearly does not fall within this exception to the rule that expert testimony is required to establish medical malpractice.

Plaintiffs wholly failed to establish by expert testimony that the treatment of Jimmy by Dr. Donlin constituted a failure to exercise that degree of care, diligence, judgment, and skill which was required of him. Therefore, the trial court properly entered the judgment of nonsuit with respect to this defendant.

### Alleged Malpractice of Dr. Dollard.

Plaintiffs contend that there was evidence adduced which would establish that Dr. Dollard was negligent in the following respects: (1) He failed to use proper surgical techniques

in the skin-grafting operations upon Jimmy; (2) he failed to use proper postoperative care to prevent infection to the patient; and (3) he discharged the patient at a time when the latter's condition required that he be kept under care.

The ground for plaintiffs' claim that Dr. Dollard failed to use proper surgical techniques in skin-grafting is stated in their brief as follows: "In this regard it is plaintiff's contention that the defendant, James E. Dollard, in removing skin from the donor sites and placing it upon the area to be grafted cut too deep removing an excessive amount of skin from the donor sites of the injured boy." Plaintiffs concede that there is no direct evidence that Dr. Dollard did cut too deeply in removing the skin from the donor sites. The claim of cutting too deeply is predicated entirely upon unusual result. Plaintiffs especially rely upon an admission made by Dr. Dollard that the scars at the donor sites are unusual and much thicker and more hypertrophied than normal scars. Dr. Bernard, on the other hand, testified without contradiction that the scars were due to infection, and while infection of donor sites is not common, it does occur. There is no expert medical testimony that Dr. Dollard's skin-grafting operations on Jimmy did not meet accepted standards of care. This court in *Fehrman v. Smirl, supra,* at page 25, refused to adopt the "rarity" test, or unusual result, as a basis for an inference of negligence in medical malpractice cases, and we adhere to that determination in the present case.

The claimed failure of Dr. Dollard to use proper postoperative care to prevent infection is based on the fact that while he had a culture taken from the leg to determine infection on May 9th he did not take another until June 26th, although the second skin-grafting was done on June 16th. At the time the second skin-grafting was accomplished the prior grafts had taken and the burned area appeared clean. Dr. Bernard testified that, if the first graft takes and the

wound remains clean, it is good practice to attempt another graft. He further testified that "we" do not necessarily wait for a negative culture to put a graft on a burn. The record is not clear whether the "we" was used by Dr. Bernard as referring to himself and his associate plastic surgeon, or whether it encompassed plastic surgeons generally. In any case, there was no expert testimony given that would afford a basis for an inference that failure to take a culture at the time of making the second set of grafts on June 16th constituted negligence on the part of Dr. Dollard.

We turn now to plaintiffs' claim that Dr. Dollard negligently discharged Jimmy when the latter's condition required that he be kept under care. This requires a consideration of the circumstances under which Jimmy left St. Mary's Hospital on July 1st, after which Dr. Dollard no longer treated him. Jimmy's father testified that some three to five days prior to July 1st Dr. Dollard told him about the June 16th grafts coming off as a result of the infection; that Jimmy was run down and would have to be built up before any more grafting could be done; and that the father should take him home and "feed him up." The father admitted that Dr. Dollard issued instructions to him as to how the dressings should be changed and that, after the boy had been taken home, he changed the dressing two or three times, and that afterwards the county nurse came and changed the dressings. The father, however, did not testify that he expected or understood that Dr. Dollard would continue to treat Jimmy after the latter's leaving the hospital on July 1st. At the time the motion for nonsuit was made, the trial court summarized the evidence in a pronouncement from the bench. In that part of this summarization which dealt with the instant phase of the case the trial court stated, ". . . there was a mutual understanding that the boy would be discharged from the hospital and that Dr. Dollard would no longer be treating him."

Five days after Jimmy was discharged from St. Mary's Hospital he was admitted to University Hospitals and placed under the care of Dr. Bernard. There is no medical testimony that during this five-day interval anything occurred to the detriment of Jimmy or which made it more difficult for Dr. Bernard to treat him.

The applicable rule of law with respect to withdrawal from a case by a physician is well stated in *Ricks v. Budge* (1937), 91 Utah 307, 314, 64 Pac. (2d) 208, as follows:

"We believe the law is well settled that a physician or surgeon, upon undertaking an operation or other case, is under the duty, in the absence of an agreement limiting the service, of continuing his attention, after the first operation or first treatment, so long as the case requires attention. The obligation of continuing attention can be terminated only by the cessation of the necessity which gave rise to the relationship, or by the discharge of the physician by the patient, or by the withdrawal from the case by the physician after giving the patient reasonable notice so as to enable the patient to secure other medical attention. A physician has the right to withdraw from a case, but if the case is such as to still require further medical or surgical attention, he must, before withdrawing from the case, give the patient sufficient notice so the patient can procure other medical attention if he desires."

See also 41 Am. Jur., Physicians and Surgeons, p. 194, sec. 72; 70 C. J. S., Physicians and Surgeons, p. 965, sec. 48 f (1); Anno. 57 A. L. R. (2d) 432, 439.

We conclude that there is no evidence which would support a finding that Dr. Dollard wrongfully withdrew from the case. Furthermore, even if he had done so, there is a complete lack of any evidence that this was causal.

Our review of the evidence bearing on possible malpractice by Dr. Dollard has demonstrated to our satisfaction that the trial court also properly granted a nonsuit with respect to this defendant.

## Res Ipsa Loquitur.

Plaintiffs contend that this is a proper case in which to invoke the doctrine of *res ipsa loquitur,* and that, if so invoked, inferences of negligence could be drawn against both defendants which would support a jury verdict in favor of plaintiffs. This court carefully considered the problem as to when *res ipsa loquitur* should be invoked in medical malpractice cases in *Fehrman v. Smirl, supra.* Under the principles enunciated therein that doctrine is not applicable to the present case. As previously pointed out, this is not a case in which jurors as laymen should be permitted to infer negligence from an unusual result. Plaintiffs' counsel strenuously argue that we should expand our holding in *Fehrman* so as to apply the "rarity" test to the instant facts. This we decline to do. Without application of the "rarity" test, no inference of negligence may be drawn by a jury under facts which are not based on expert medical testimony. In this case the expert medical testimony adduced by plaintiffs is wholly insufficient to support such an inference.

## Rulings On Evidence.

Plaintiffs cite two incidents of alleged prejudicial erroneous exclusion of evidence by the trial court in support of their claim to a new trial.

The facts with respect to the first of these is as follows: Plaintiffs called Sister Mary Lillian, superintendent of St. Mary's Hospital, as a witness and she testified that about July 3, 1961, she had a conversation with the county nurse in regard to the hospitalization of Jimmy at St. Mary's. She was then asked this question by plaintiffs' counsel, "What did you tell her?" Counsel for Dr. Dollard objected to the question and the objection was sustained.

Plaintiffs' argument as to why they contend this ruling was erroneous is that to allow the question to be answered

would be a proper exception to the hearsay rule "to show the facts and circumstances surrounding the discharge of Jimmy Lincoln from the hospital which is one element of malpractice negligence claimed against Dr. Dollard." Such a contention is wholly without merit. There is no claim that the witness or the hospital was the agent of Dr. Dollard. Therefore, it would be entirely irrelevant what the witness told the county nurse. What would be relevant would be testimony by Sister Mary Lillian as to what Dr. Dollard told her regarding Jimmy's discharge from the hospital on July 1st, but the question to which the objection was sustained was not framed to elicit this information.

The second ruling on evidence attacked by plaintiffs relates to the trial court's excluding any testimony with respect to Dr. Dollard's absence from the state for several months at the time of the commencement of the action. It is plaintiffs' contention that Dr. Dollard left the state so as to avoid service of the summons upon him, and that this conduct was in the nature of an admission. In support of this contention plaintiffs cite 2 Jones, Evidence, Civil and Criminal (5th ed.), p. 717, sec. 386, and 20 Am. Jur., Evidence, p. 273, sec. 293. These authorities hold that evidence of flight by a person suspected of or charged with a crime or wrongdoing is admissible against him. This rule seems to be largely confined to defendants in criminal proceedings. Moreover, it is evidence which is merely corroborative in character and, standing alone, would be insufficient to support a finding of guilt or wrongdoing. The trial court rightly excluded the offered evidence because there was absent from the record any evidence of negligence on Dr. Dollard's part which this would tend to corroborate.

*By the Court.*—Judgment affirmed.

WILKIE, J., took no part.