BURNSIDE, Appellant, v. EVANGELICAL DEACONESS HOSPITAL and others, Respondents.

*No. 187. Argued March 6, 1970.—Decided March 31, 1970.*
(Also reported in 175 N. W. 2d 230.)

520

For the appellant there were briefs and oral argument by *John A. Udovc* of Milwaukee.

For the respondents there was a brief by *Wickham, Borgelt, Skogstad & Powell,* attorneys, and *Donald R. Peterson* of counsel, all of Milwaukee, and oral argument by *Mr. Peterson.*

HALLOWS, C. J.   Burnside, thirty-five years old and a machinist for fifteen years, first experienced pain in his back in 1951 and has had continual back trouble since 1955. In the spring of 1966, he consulted several doctors but treatment failed to relieve the pain. In September of 1966, he was referred to the defendant Dr. Jack D. Spankus, an orthopedic surgeon who on September 11, 1966, performed a laminectomy and discectomy on a herniated disc between the fourth and fifth lumbar vertebrae. The purpose of this operation was to remove the disc or fragments thereof which were pressing on the nerve root. Instead of being a soft, spongy cushion, Burnside's disc was hardened. When Dr. Spankus finished removing the parts of the disc and before closing the opening he could see no remaining loose pieces of the disc.

Burnside's recovery from the operation for some months was uneventful and satisfactory. On December 15, 1966, he consulted Dr. Spankus and complained that the back and leg pain had resumed and that some two weeks prior he had had flu and a cold. A second laminectomy and discectomy was performed by Dr. Spankus on

January 5, 1967. The operative record dictated by Dr. Spankus states that "an extruded disc was found under the L–4 nerve root. Apparently it was a fragment of the previous disc taken out. This fragment under the nerve root was not present at the previous operation."

Burnside argues the disc fragment removed in the second operation from under the nerve root was left behind in the first operation through negligence of Dr. Spankus. The defense contends a fragmentation of the remaining portion of the degenerated disc occurred subsequent to the first operation and was caused by Burnside's sneezing, coughing, and hacking, when he had the flu; and further, that even if Dr. Spankus had left a fragment upon the completion of the first operation, he was not negligent because he used that degree of skill and care which orthopedic specialists in the Milwaukee area used in such an operation. Burnside's damages which are not in dispute consist of loss of wages, permanent disability in the use of his right foot, numbness, pain, and more frequent urination.

On this appeal from a directed verdict this court must make the assumption the fragment was left behind from the first operation because the evidence must be viewed in the light most favorable to Burnside. *Schumacher v. Klabunde* (1963), 19 Wis. 2d 83, 119 N. W. 2d 457; *United States Fidelity & Guaranty Co. v. Milwaukee & Suburban Transport Corp.* (1962), 18 Wis. 2d 1, 117 N. W. 2d 708.

When a physician exercises that degree of care, judgment, and skill which physicians in good standing of the same school of medicine usually exercise in the same or similar localities under like or similar circumstances, having due regard to the advanced state of medical science at the time, he has discharged his legal duty to his patient. *Ahola v. Sincock* (1959), 6 Wis. 2d 332, 348, 94 N. W. 2d 566; *Kuehnemann v. Boyd* (1927), 193 Wis. 588, 591, 214 N. W. 326, 215 N. W. 455; *Jaeger v. Strat-*

*ton* (1920), 170 Wis. 579, 581, 176 N. W. 61; *McManus v. Donlin* (1964), 23 Wis. 2d 289, 127 N. W. 2d 22.

Prior to 1963, the doctrine of *res ipsa loquitur* was not applicable to medical malpractice cases. In *Fehrman v. Smirl* (1963), 20 Wis. 2d 1, 121 N. W. 2d 255, 122 N. W. 2d 439, this court overruled prior cases and adopted the general rule that *res ipsa loquitur* may be invoked in medical malpractice actions when a layman is able to say as a matter of common knowledge that the consequences of the professional treatment are not those which ordinarily result if due care is exercised. This court also adopted the minority rule that when there is no basis of common knowledge for such a conclusion, an instruction embodying *res ipsa loquitur* may be grounded on expert medical testimony. *Shurpit v. Brah* (1966), 30 Wis. 2d 388, 141 N. W. 2d 266; *Fehrman v. Smirl, supra; see Knief v. Sargent* (1968), 40 Wis. 2d 4, 161 N. W. 2d 232.

Prosser in his *Law of Torts* (2d ed.), pp. 210, 211, sec. 42, gives examples of situations in which the common knowledge of a layman affords the proper basis for invoking the doctrine such as a sponge left in the patient's interior, removal or injury to an inappropriate part of his anatomy, a tooth dropped down his windpipe, a serious burn from a hot water bottle, or instruments not sterilized. In these situations it is common knowledge the thing speaks for itself and does not need the aid of an expert's opinion.

Is it within the field of common knowledge of laymen that a piece of herniated disc is not ordinarily left unremoved in an operation if due care is exercised by the surgeon performing the laminectomy and discectomy? Or, to put it another way, does common knowledge of lay persons justify the drawing of an inference of negligence from circumstantial evidence?

A herniated disc operation is performed by the surgeon looking down on top of the back toward the anterior

part of the body and with small instruments removing the tiny pieces of bone from each side of a small V-shaped bony bridge in an area about one-half inch in diameter to permit a view of the spinal cord and the nerve roots which come out sideways. Then a special retractor, about an eighth of an inch wide, is placed behind the nerve root which is pulled back to get a bulge off to the side so the surgeon can look underneath and around the nerve root for the disc material. This is grizzly, crabtail material which is tickled out with a tweezers. The surgeon with small instruments then reaches inside the hole, which is about the size of a tip of a regular pencil, and trys to remove as much of the disc material as possible without going through the ligament or into the blood vessel or damaging the nerve cord. When this was done and Dr. Spankus was ready to close up the operation, he testified he could see no remaining loose pieces of disc.

There is no question of the standard of care. The court took judicial notice of the standard spelled out in Lewis, *Practice of Surgery,* as independent substantive evidence. *Lewandowski v. Preferred Risk Mut. Ins. Co.* (1966), 33 Wis. 2d 69, 146 N. W. 2d 505. Dr. Spankus testified a thorough search for loose fragments in the area before closing the incision is a standard of skill and care used by orthopedic surgeons in such operations. He also testified "if I had not searched for a loose fragment and had left a loose fragment behind, I would have departed from that standard of skill and care" and that it is nearly impossible to get all the disc fragments out in such an operation and second operations are necessary in three percent to five percent of the cases.

There is no evidence that Dr. Spankus did not look and make a thorough search to remove all the disc fragments as he testified except the unexplained presence of the fragment itself. It is argued this loose or separated fragment of the disc was firmly imbedded in scar tissue and was so large it was removed in three

pieces and therefore any doctor should have seen it during the first operation. There was no medical testimony that in this type of operation if a fragment was left behind it would be because the surgeon was negligent.

Consequently, unless this is a situation where a layman from common knowledge may be permitted to draw an inference of negligence in performing the first operation from the fact there was a disc fragment pressing on a nerve when the second operation was performed four months after the first operation, the burden of proof has not been met. We think that because of the complicated nature of the operation and its surgical difficulties that it is not within the common knowledge of a layman that leaving a part of the disc is not an ordinary result if due care is exercised by the surgeon. A layman does not know whether in a laminectomy and discectomy of a herniated disc all the disc should be removed or only the extruded part or only the loose fragments. This is not analogous to a surgeon leaving a surgical instrument or sponge or other foreign object in the area of the operation.

After the second operation Dr. Spankus ordered a catheterization. Both the respondents, Drs. Raymond Chi-Ta-Tse and R. R. Brazy, tried unsuccessfully in the recovery room to catheterize Burnside. Brazy testified there was some kind of an obstruction which stopped the catheter. After about an hour Dr. Spankus was contacted who told them to desist. During this procedure Burnside passed approximately 60 milliliters of urine and clotted blood. Brazy testified this was a significant but small amount of liquid (about two fluid ounces). After Burnside came out of the anesthesia his penis was sore and swollen and he had severe pain during urination. However, the following morning he voided about 10 fluid ounces of urine which was clear of blood although urination was painful.

Burnside contends the discharge of this blood and the great pain during urination are not expected results of an operation on a back and any layman is competent to conclude from common knowledge that such results should not happen if there has been proper skill and care used in the back operation. There is only a superficial resemblance of these facts to *Beaudoin v. Watertown Memorial Hospital* (1966), 32 Wis. 2d 132, 145 N. W. 2d 166. In that case a layman was able to conclude as a matter of common knowledge that the second-degree burns on the plaintiff's body not directly related to the operative procedure did not ordinarily result if due care was used. Nor are the facts comparable to *Ybarra v. Spangard* (1944), 25 Cal. 2d 486, 154 Pac. 2d 687, in which the California Court held the plaintiff was entitled to the doctrine of *res ipsa loquitur* where a traumatic shoulder injury occurred while under anesthesia during an appendectomy.

In the instant case the blood and pain were caused by the attempted catheterization not by the back operation, and there is no expert testimony establishing the community standards for doctors in performing a catheterization. Dr. Brazy did testify that 60 milliliters of liquid and clotted blood was not a usual or expected result from catheterization but the finding of blood is an expected result when the catheter meets with an obstruction. While a layman might speculate upon the skill and competence of the doctors who attempted the catheterization, we do not think this procedure is so well known and understood by lay people that it permits a jury to infer negligence on the part of the doctors from any fact of common knowledge possessed by laymen.

It is further argued that the amount of bleeding was an unusual or rare result and a layman ought to be permitted to infer negligence from such a result. This argument was rejected in *McManus v. Donlin* (1964), 23 Wis. 2d 289, 127 N. W. 2d 22, and in *Fehrman v. Smirl, supra,*

when this court refused to extend *res ipsa loquitur* to incorporate the so-called "rarity" test in malpractice cases. We again state that "rarity" is an insufficient basis on which to predicate negligence.

The court has considered the other points raised but they need not be commented upon and they do not constitute grounds for a new trial in the interest of justice.

*By the Court.*—Judgment affirmed.