SCHROEDER, Administratrix, and others, Plaintiffs and Respondents, v. NORTHERN STATES POWER COMPANY, Defendant and Respondent: CITY OF LA CROSSE, Defendant and Appellant.*

*No. 215. Argued March 30, 1970.—Decided April 28, 1970.*
(Also reported in 176 N. W. 2d 336.)

* Motion for rehearing denied, with costs, on June 26, 1970.

638

For the defendant-appellant there was a brief by *Edwards, Hafner & McDonald* of La Crosse, and oral argument by *Roger W. Hafner.*

For the plaintiffs-respondents there was a brief by *Bosshard, Sundet & Nix,* and by *Steele, Smyth, Klos & Flynn* and *Marvin H. Davis,* all of La Crosse, and oral argument by *Mr. Davis.*

For the defendant-respondent there was a brief by *Johns, Flaherty, Harman & Gillette* of La Crosse, and oral argument by *Robert D. Johns.*

HEFFERNAN, J.   It was undisputed that the medium-pressure gas main located 42 inches below the surface of the road in front of the Saley home was defectively welded. Northern States Power Company, hereinafter referred to as the power company, points out, however, that, although the weld was defective, it had properly contained the gas from 1928 until the time of the explosion in 1966. It contended that the cause for the disjointing of the weld in January, 1966, was negligently performed city excavation work in the street during

June, 1965. The only issue on this appeal is whether the jury's verdict, finding the city of La Crosse causally negligent in that respect, is supported by credible evidence. In *Cedarburg Light & Water Comm. v. Allis-Chalmers* (1967), 33 Wis. 2d 560, 564, 148 N. W. 2d 13, 149 N. W. 2d 661, the court said:

"Upon review in this court we are committed to the rule that the judgment must be upheld if there is any credible evidence which under any reasonable view admits of an inference supporting the verdict. *Burlison v. Janssen* (1966), 30 Wis. (2d) 495, 141 N. W. (2d) 274; *Zweifel v. Milwaukee Automobile Mut. Ins. Co.* (1965), 28 Wis. (2d) 249, 137 N. W. (2d) 6. Our search is only for evidence supporting the jury's findings. *Olson v. Milwaukee Automobile Ins. Co.* (1954), 266 Wis. 106, 62 N. W. (2d) 549, 63 N. W. (2d) 740. These standards apply not only as to the presence of negligence but also as to the existence of causation. *Milwaukee & Suburban Transport Corp. v. Royal Transit Co.* (1966), 29 Wis. (2d) 620, 139 N. W. (2d) 595; *Krause v. Menzner Lumber & Supply Co.* (1959), 6 Wis. (2d) 615, 95 N. W. (2d) 374."

The evidence revealed that a 36-inch sewer main had been laid in the center of the road at a depth of 17 feet below the road's surface. Two gas mains were located south of the center line of the road. A low-pressure main was 36 inches below the surface, and a medium-pressure main—the main that ruptured—was located 42 inches below the surface of the road.

In the spring of 1965 the city of La Crosse experienced the worst flood conditions in its history. The Saley home was located within a few blocks of the Black river. Shortly after the subsidence of the flood conditions, a depression appeared in the street surface in front of the Saley home. The area was barricaded until such time as repairs could be made. In June, 1965, the area was excavated, and it was found that there was a break in the sewer main and in the riser which connected with the

sanitary sewer laterals that ran from the Saley home and from the home across the street. The evidence indicated that, during the flood conditions, water had flowed into the sewer and carried with it a portion of the earth that had supported the roadway. When the street was deprived of its subterranean support, it collapsed in the area of the break.

To rectify this situation, the city excavated the street to the level of the broken sewer main 17 feet below the surface of the street. A large area of the blacktop was removed, and the patch that was subsequently placed on the surface of the road was approximately 29 feet in length and 22 feet in breadth. The evidence revealed that this patch was in part placed directly above the area of the broken main. Only a portion of the street area that was broken open was, however, actually excavated to sewer depth. There was evidence to indicate that the city made a rectangular excavation approximately 8 feet by 8 feet in size directly over the break in the sewer. There was testimony that indicated that the edge of the excavation was approximately a foot and a half from the weld, the disjointing of which caused the fatal explosion six months later.

There was also evidence which the power company contends indicates that the area of the medium-pressure main where the break occurred was within the confines of the excavation, at least in the earlier stages of the excavation. The power company bases this contention upon the fact that, during the course of this excavation, it was necessary for the power company to disconnect the service lateral to the Saley home.

It is undisputed that the city had done the excavation which exposed the service line to which the power company had attached a temporary bridge so that gas service at the Saley home would not be interrupted while the city's excavation work was going on. Photographs reveal that the disconnection point on the service line was

directly over the medium-pressure line which had fractured and within a few inches of where the fracture occurred. The city contended, however, that, as it excavated, sheeting was placed around the perimeters of its excavation to prevent any lateral shift of earth from outside of the work area. The record was replete with testimony that the entire subsurface soil consisted of river sand, a soil that is notorious for lack of bearing capacity unless properly compacted. It was the contention of the power company and of the plaintiff that the city had failed to properly compact the soil when backfilling the excavation.

After the gas explosion a trench was dug by the power company parallel to the broken main. When the earth was removed from atop the main, the pipe rose an appreciable amount. It was the contention of the plaintiff and of the power company that this was evidence of a diminution of the support of the earth under the pipe. The power company claimed that it was this condition which occasioned the break in the pipe.

When the city completed its repairs to the main sewer and the riser, the earth was replaced and, according to the testimony of Grant Haugstad, a sewage department supervisor, the sand was tamped with a hand tamper every two feet. This procedure was followed until the excavation was filled to the top of the riser, approximately 5 feet above the level of the main sewer and 12 feet below the road surface.

There was testimony to show that good backfilling practice would have dictated flushing water into the excavation to compact the soil. This was not done, according to the city's witnesses, because the concrete had not yet set. There was evidence to show that, had the city been willing to wait another day, the concrete would have set and the backfilling at this point could have been accomplished by flushing as well as tamping. Although there was evidence that flushing was used after the com-

pletion of the fill to the riser level, a careful reading of the transcript reveals no flushing or puddling thereafter. The backfilling continued by alternately filling in a foot and a half or two feet of sand and then hand tamping.

The power company took the position that backfilling by filling and tamping only every two feet and flushing on but one occasion was negligence. That such negligence caused the loss of support to the pipe was demonstrated when the pipe sprang up when the surface earth was removed.

There was also some testimony that the city had used an excessively thick blacktop patch. The city countered this evidence by introducing the results of earth borings. In general, these borings tended to show that the earth was as well compacted in the area of the excavation as it was in the street outside of the excavation area.

The power company asked the court to take judicial notice of subsection (E) (4) of sec. 5.11 of the municipal ordinances of the city of La Crosse. This ordinance entitled, "Street and Sidewalk Excavations and Openings," provides that no openings shall be made in any street without a permit from the Director of Public Works. Subsection (E) (4) of the ordinance establishes standards for backfilling openings in the streets. That ordinance, in part, provides:

"In refilling the opening, the earth must be puddled or laid in layers not more than 6 inches in depth and each layer rammed, tamped, or flushed to prevent after-settling."

The power company contended that the ordinance was a safety ordinance and that its violation constituted negligence per se. In view of the testimony of Grant Haugstad to the effect that the excavation was filled in layers of two feet, rather than six inches as required by the ordinance, the power company asked the court to find the

city negligent as a matter of law. The trial court denied this motion. When the case was submitted to the jury, the jury was instructed:

"With respect to the defendant, city of La Crosse, the ordinance of the city of La Crosse provides in opening any street or sidewalk, the paving materials, sand, gravel and earth or other material moved or penetrated and all surface monuments or hubs must be removed and replaced as nearly as possible in their original condition or position and the same relation to the remainder as before. In refilling the opening, the earth must be puddled or laid in layers not more than six inches in depth and each layer rammed, tamped, or flushed to prevent after-settling."

The ordinance was not admitted in evidence and was not submitted to the jury. The record is silent in regard to any objection by the city to the inclusion of this excerpted portion of the ordinance in the instructions. The city's only position of record in regard to this ordinance was in respect to its opposition to the power company's motion that the city be found negligent as a matter of law. Having prevailed upon that motion, it apparently did not further object to the use of the ordinance in the instructions. As we have frequently said, a party that acquiesces without objection to the inclusion of a portion of the instructions cannot later be heard to object on appeal. *Jansen v. Vils* (1967), 34 Wis. 2d 332, 337, 149 N. W. 2d 551; *Savina v. Wisconsin Gas Co.* (1967), 36 Wis. 2d 694, 701, 702, 154 N. W. 2d 237. We therefore conclude that the city of La Crosse may not at this time object to the instructions as given. We conclude, moreover, that the instruction was properly given, although in so doing we do not concur completely with the position of the power company.

A fair reading of the entire ordinance reveals that it was the obvious intent of the ordinance to make sure that the *street* was not permanently damaged or the city

or the users of the highway exposed to hazards which would result from a defective surface in the road. While the ordinance is clearly a safety ordinance in respect to vehicular and pedestrian traffic on the street, it does not have as its apparent purpose the protection of either adjacent property owners or other utilities which share the area beneath the road surface and in the vicinity of the excavation.

While this court has frequently found that the violation of a safety ordinance is negligence per se, we have consistently avoided a broad construction of these statutes and have declined to extend the legislative ambit of protection afforded by them unless the legislature's intention so to do was clear. The question which a court must decide, even when it is clear the ordinance is a safety ordinance, is whether the purpose of the ordinance was to protect the party seeking to invoke it, *i.e.*, was he within the class of persons that the legislature plainly intended to protect.

In *Burke v. Milwaukee & Suburban Transport Corp.* (1968), 39 Wis. 2d 682, 690, 159 N. W. 2d 700, the court held that a statute which required a bus to stop within a short distance of the curb was intended not to protect a passenger who might step down to the street, but was rather designed by the legislative body to get buses out of the lane of traffic and over to the curb to avoid interference or collisions with vehicular traffic on the street itself. In *Burke*, at page 690, we quoted with approval the rationale from *Delaney v. Supreme Investment Co.* (1947), 251 Wis. 374, 380, 29 N. W. 2d 754:

" '. . . statutes are not to be extended so as to impose any duty beyond that imposed by the common law unless such statute clearly and beyond any reasonable doubt expresses such purpose by language that is clear, unambiguous, and peremptory.' "

We further stated in *Burke*, at page 690:

"Guided by this principle, this court has narrowly construed the legislative intent of various statutes and ordinances and has limited the persons protected and the hazards protected against to the intendment of the statute. *See, e.g., Meihost v. Meihost* (1966), 29 Wis. 2d 537, 139 N. W. 2d 116; *Szafranski v. Radetzky* (1966), 31 Wis. 2d 119, 141 N. W. 2d 902; *Kalkopf v. Donald Sales & Mfg. Co.* (1967), 33 Wis. 2d 247, 147 N. W. 2d 277; *Blanchard v. Terpstra* (1967), 37 Wis. 2d 292, 155 N. W. 2d 156; *Reque v. Milwaukee & Suburban Transport Corp.* (1959), 7 Wis. 2d 111, 95 N. W. 2d 752, 97 N. W. 2d 182."

Applying this rule of strict construction, we conclude that the clear violation of the statute was not negligence per se, since neither the gas company nor the deceased householders were within the protection intended by the ordinance. We conclude, therefore, that it would have been error for the trial judge to have found the city negligent per se and to have answered the question of the city's negligence without submission to the jury.

Although the trial judge properly denied the motion of the power company, we conclude that it properly included in its instructions the standards which the city had adopted as evidence of proper backfilling. The jury could conclude that a deviation from these standards was evidence of negligence. Such application of a safety ordinance has won the approval of text writers.

". . . where the statute does set up standard precautions, although only for the protection of a different class of persons, or the prevention of a distinct risk, this may be a relevant fact, having proper bearing upon the conduct of a reasonable man under the circumstances, which the jury should be permitted to consider." Prosser, *Law of Torts*, p. 203, sec. 35.

The jury was therefore properly instructed and could consider the ordinance for that purpose. There was evidence in the record to show that the backfilling technique

actually used by the city's employees was less effective than that contemplated by the ordinance. There was testimony that indicated that the method used by the city would result in at least five percent less compaction than would have resulted with a proper backfilling. A difference of three inches of compaction would have resulted even in the first five feet above the level of the main sewer. There was credible evidence to show that a reasonable man would not have backfilled in the manner followed by the city. The jury's verdict that the city was negligent in that respect is supported by credible evidence.

We are equally satisfied that there was evidence to support the jury's verdict that the negligence of the city was causal. Although the testimony is disputed, there was evidence to show, and from which the jury could have concluded, that a portion of the excavation was immediately under the main that fractured. There was evidence from which the jury could have concluded that the river sand under the pipes was of low weight-bearing quality and would be prone to shifting unless backfilling and tamping were done with reasonable care.

The city contends on this appeal that there were other possible causes for the erosion of the soil near the broken gas main, particularly the high underground water of the early spring, and it contends that, in the absence of ruling out other causes, the jury's finding that the city's negligence was causal was mere speculation. We do not agree, nor do we conclude that additional expert testimony would have been necessary to establish that defendant's negligence was a substantial factor in causing the fracture. The trial judge properly concluded:

"In the present case, the settling of loose sand is a matter of common knowledge. The jury could so conclude without the assistance of expert testimony."

The question of cause was properly submitted to the jury in the instruction directing:

". . . it must appear that the negligence under consideration was a substantial factor in producing the explosion as a natural result."

In *Jeffers v. Peoria-Rockford Bus Co.* (1957), 274 Wis. 594, 603, 80 N. W. 2d 785, and again in *Milwaukee & Suburban Transport Corp. v. Royal Transit Co.* (1966), 29 Wis. 2d 620, 628, 139 N. W. 2d 595, we relied upon the following quotation from Prosser, in deciding whether the question of cause was for the jury:

" 'Prosser, Law of Torts (2d ed.), p. 281, sec. 50, states that *"where reasonable men could not differ* as to whether the defendant's conduct was, or was not, a substantial factor in producing the result" the determination of the question of causation is for the court, but "in cases *where reasonable men might differ—which will include all but a few of the cases* in which the issue is in dispute at all—*the question is one for the jury."* (Emphasis supplied.)' "

While reasonable men might differ in determining whether or not the negligence of the city caused the shifting of sand and the gas explosion, the decision was clearly one for the jury.

Under the circumstances herein, where the facts indicated that improperly backfilled earth would be prone to additional settling, and where there was evidence (the rising of the pipes when uncovered) that the main located either in the excavation itself or within less than two feet thereof was deprived of proper subterranean support, the jury could conclude that the negligent backfilling was a cause of the fracture of the pipe.

*By the Court.*—Judgment affirmed.