SHIER, Appellant, v. FREEDMAN, Respondent.*

*No. 5. Argued February 28, 1973.—Decided April 20, 1973.*
(Also reported in 206 N. W. 2d 166 and 208 N. W. 2d 328.)

* Motion for rehearing denied, without costs, on June 29; 1973.

272

274

For the appellant there were briefs by *Kersten & McKinnon*, attorneys, and *George P. Kersten* of counsel, all of Milwaukee, and oral argument by *George P. Kersten*.

For the respondent there was a brief by *Fulton, Menn & Nehs, Ltd.*, attorneys, and *Peter S. Nelson* of counsel, all of Appleton, and oral argument by *Mr. Nelson*.

BEILFUSS, J. The most important issue before us in this case is whether the "locality rule" in medical malpractices in Wisconsin should be abrogated both as to general practitioners and specialists.

For over eighty years Wisconsin has followed the locality rule. *Gates v. Fleischer* (1886), 67 Wis. 504, 30 N. W. 674. One of the most accurate statements of the rule was pronounced in *Burnside v. Evangelical Deaconess Hospital* (1970), 46 Wis. 2d 519, 175 N. W. 2d 230. This court stated at pages 522, 523:

"When a physician exercises that degree of care, judgment, and skill which physicians in good standing of the same school of medicine usually exercise in the same or similar localities under like or similar circumstances, having due regard to the advanced state of medical science at the time, he has discharged his legal duty to his patient. *Ahola v. Sincock* (1959), 6 Wis. 2d 332, 348, 94 N. W. 2d 566; *Kuehnemann v. Boyd* (1927), 193 Wis. 588, 591, 214 N. W. 326, 215 N. W. 455; *Jaeger v. Stratton* (1920), 170 Wis. 579, 581, 176 N. W. 61; *McManus v. Donlin* (1964), 23 Wis. 2d 289, 127 N. W. 2d 22."

The rationale for the rule was first expressed in *Small v. Howard* (1880), 128 Mass. 131, 136. It was stated:

". . . It is a matter of common knowledge that a physician in a small country village does not usually make a specialty of surgery, and, however well informed he may be in the theory of all parts of his profession, he would, generally speaking, be but seldom called upon as a surgeon to perform difficult operations. He would have but few opportunities of observation and practice in that line such as public hospitals or large cities would afford. The defendant was applied to, being the practitioner in a small village, and we think it was correct to rule that 'he was bound to possess that skill only which physicians and surgeons of ordinary ability and skill, practising in similar localities, with opportunities for no larger experience, ordinarily possess; and he was not bound to possess that high degree of art and skill possessed by eminent surgeons practicing in large cities, and making a specialty of the practice of surgery.' "

The basis for this rule was that a physician at that time in a small town lacked the opportunity to keep abreast of the advances in the medical profession and that he did not have the most modern facilities to provide care and treatment for his patients. Under these circumstances it would be unfair to hold such a doctor to the same standards of care as doctors who have such opportunities and facilities in larger cities.

The modern trend is not to base the standard of care on geographic localities. Rather, the test is whether the doctor failed under the circumstances of each case in question to exercise that degree of skill and knowledge that is usually exercised in similar cases by other members of the medical profession generally. 37 A. L. R. 3d 420, 432. The rationale for abrogating the locality rule and adopting the modern trend is well expressed in the following two cases. In *Pederson v. Dumouchel* (1967), 72 Wash. 2d 73, 77–79, 431 Pac. 2d 973, the Washington Supreme Court en banc stated:

"The original reason for the 'locality rule' is apparent. When there was little intercommunity travel, courts required experts who testified to the standard of care

that should have been used to have a personal knowledge of the practice of physicians in that particular community where the patient was treated. It was the accepted theory that a doctor in a small community did not have the same opportunities and resources as did a doctor practicing in a large city to keep abreast of advances in his profession; hence, he should not be held to the same standard of care and skill as that employed by doctors in other communities or in larger cities. Parenthetically, we note that the law of this jurisdiction has never recognized a difference in the professional competency of a lawyer in a small community from that of the professional competency required of a lawyer in a large city.

"The 'locality rule' had two practical difficulties: first, the scarcity of professional men in the community who were qualified or willing to testify about the local standard of care; and second, the possibility of a small group, who, by their laxness or carelessness, could establish a local standard of care that was below that which the law requires. The fact that several careless practitioners might settle in the same place cannot affect the standard of diligence and skill which local patients have a right to expect. Negligence cannot be excused on the ground that others in the same locality practice the same kind of negligence. No degree of antiquity can give sanction to usage bad in itself.

"Broadening the rule to include 'similar localities' or 'similar communities' alleviated, to a certain extent, the first practical difficulty of the 'locality rule'—additional witnesses might be available; but it did little to remove the deficiencies springing from the second.

". . .

"Now there is no lack of opportunity for a physician or surgeon to keep abreast of the advances made in his profession and to be familiar with the latest methods and practices adopted.

" 'The comprehensive coverage of the Journal of the American Medical Association, the availability of numerous other journals, the ubiquitous "detail men" of the drug companies, closed circuit television presentations of medical subjects, special radio networks for physicians, tape recorded digests of medical literature, and hundreds of widely available postgraduate courses all serve to keep physicians informed and increasingly to establish nation-

wide standards. Medicine realizes this, so it is inevitable that the law will do likewise. D. Louisell and H. Williams, The Parenchyma of Law 183 (Professional Medical Publications, Rochester, N. Y. 1960).'

"We have found no better statement of existing conditions. The 'locality rule' has no present-day vitality except that it may be considered as *one* of the elements to determine the degree of care and skill which is to be expected of the average practitioner of the class to which he belongs. The degree of care which must be observed is, of course, that of an average, competent practitioner acting in the same or similar circumstances. In other words, local practice within geographic proximity is one, but not the only factor to be considered. No longer is it proper to limit the definition of the standard of care which a medical doctor or dentist must meet solely to the practice or custom of a particular locality, a similar locality, or a geographic area.

"The 'locality rule' has never been suggested in any English case. (Nathan, Medical Negligence (Butterworth & Co., Ltd. 1957), p. 21.) In England, the same standard is applicable throughout the country. The extent of our country is such, however, that we hesitate to fix a definite geographic limit upon the standard of care—be it statewide or expanded to the Pacific Northwest, as suggested by plaintiff's requested instruction.

"A qualified medical or dental practitioner should be subject to liability, in an action for negligence, if he fails to exercise that degree of care and skill which is expected of the average practitioner in the class to which he belongs, acting in the same or similar circumstances. This standard of care is that established in an area coextensive with the medical and professional means available in those centers that are readily accessible for appropriate treatment of the patient. . . ."

In *Douglas v. Bussabarger* (1968), 73 Wash. 2d 476, 489, 490, 438 Pac. 2d 829, the court stated:

"Admittedly, there probably was considerable justification for the local standard rule in frontier days. Dean Prosser points out that the original rationale for this rule was that in early America a country doctor did not have the facilities, contacts, or opportunities for learning

and experience afforded by large cities. W. Prosser, Torts sec. 32, at 166 (3d ed. 1964). But times have changed. Modern means of transportation permit country doctors to attend up-to-date medical seminars; the general circulation of medical journals makes new developments readily available to them, and they can easily and quickly communicate with the most modern and up-to-date medical centers in cities throughout the United States. As has been pointed out, today's rural practitioner can and does give and receive advice transmitted thousands of miles over the telephone, and he is expected to keep himself apprised of recent developments as they are regularly published in medical journals. F. Spies, *Arkansas Model Jury Instructions: Malpractice*, 20 Ark. L. Rev. 86 (1966).

"The editorial board of the Stanford Law Review conducted a survey to determine to what extent the practice of medicine within each of the nineteen recognized specialties of the American Medical Association is similar throughout the country. Letters and questionnaires were sent to each of the American Specialty Boards, the American Medical Association and American Hospital Association, publishers of medical specialty journals, and medical specialty societies. The letters and questionnaires were written with the aid of the Stanford University School of Medicine and several practicing physicians. The conclusion reached was as follows:

" 'On the basis of the existence of standardized requirements for certification, subscriptions to medical specialty journals, medical specialty societies, and statements from American Specialty Boards, it is concluded that the practice of medicine by certified specialists within most medical specialties is similar throughout the country. Note, *Medical Specialties and the Locality Rule,* 14 Stan. L. Rev. 884, 887–88 (1962).'

The results of this survey, although cautiously worded, confirm what was fairly obvious; *viz.* that there is no longer any basis in fact for the 'locality rule.'

"Rural and small-town doctors should not enjoy advantages not given by the law to any other class of rural and small-town tort defendants. When patients considering operations approach doctors in Raymond, the doctors do not admit that they can be a little more careless and act with less responsibility than can doctors in Olympia,

who can be a little more negligent than doctors in Tacoma, who can be a little more negligent than doctors in Seattle, who can be considerably more negligent than the doctors in New York City. Certainly, if doctors should freely indicate such discrepancies in medical practice, it would not be surprising that there would be a decrease in the number of operations in Tacoma and Olympia—and a greater decrease still in the Raymond area.

"Many courts have already recognized this situation. Dean Prosser notes the following in regard to the 'locality rule,' W. Prosser, *supra,* at 166–67:

" 'The older decisions sometimes stated this as a standard of the "same locality;" but this is now quite generally recognized as too narrow. Later cases expanded it to speak of "the same or similar localities," thus including other towns of the same general type. The present tendency is to abandon any such formula, and treat the size and character of the community, in instructing the jury, as merely one factor to be taken into account in applying the general professional standard.'

Dean Prosser cites cases from California, Pennsylvania, North Dakota, Iowa, Idaho, New Jersey and Florida in support of his statement. The decision in *Pederson v. Dumouchel,* 72 Wn. 2d 73, 431 P. 2d 973 (1967) aligns Washington with these states, and updates Washington law with regard to the realities of the contemporary medical practice."

The same reasons that prompted the Washington court to abrogate the locality rule apply with equal logic and persuasion in Wisconsin. Henceforth,[2] in instructing juries in medical malpractice cases, the jury should be told in substance that a qualified medical (or dental) practitioner, be he a general practitioner or a specialist, should be subject to liability in an action for negligence if he fails to exercise that degree of care and skill which is exercised by the average practitioner in the class to which he belongs, acting in the same or

---

[2] This change is not retroactive and will affect only those cases tried after the date of this opinion.

similar circumstances. Geographical area and its attendant lack of facilities are circumstances that can be considered if appropriate.

The defendant's claim is that the locality rule is the law of this case by virtue of a previous appeal in this matter upon a procedural question.[3] We need not reach this issue because of our opinion that the judgment dismissing the complaint should be affirmed.

The plaintiff has asked for a new trial because of alleged errors in the instructions to the jury, including the locality rule. Even if we were to hold that the abrogation of the locality rule should be retroactive and apply to this case, we do not believe the failure to give such an instruction could be prejudicial.

Only one witness, Dr. Oudenhoven, testified for the plaintiff. Several specialists, including qualified orthopedic surgeons and neurosurgeons, all unequivocally testified that Dr. Freedman was not negligent. Dr. Nellen testified, in response to a question based upon the locality rule, that Dr. Freedman was not negligent under medical standards here or anywhere else. The principal question was who severed the sacral nerve roots? It is apparent the jury concluded that Dr. Freedman did not. It is not probable another jury with the new instruction as now contemplated would have come to a different result. The substantial rights of the plaintiff were not affected and a new trial will not be ordered.[4]

Other claimed errors in the jury instructions are alleged. We do not think the instructions were erroneous nor was timely objection made to them; accordingly, the error, if any, was waived.[5]

---

[3] *Shier v. Freedman* (1970), 49 Wis. 2d 41, 181 N. W. 2d 400.

[4] *See* sec. 274.37, Stats., and *Lisowski v. Milwaukee Automobile Mut. Ins. Co.* (1962), 17 Wis. 2d 499, 117 N. W. 2d 666.

[5] *Schroeder v. Northern States Power Co.* (1970), 46 Wis. 2d 637, 176 N. W. 2d 336.

We were also urged to grant a new trial in the interest of justice under sec. 251.09, Stats. From a detailed reading of the entire record we are of the opinion that the case has been fully and fairly tried, that it is not probable that a new trial would bring a different result, or that the jury finding that Dr. Freedman was not negligent resulted in a miscarriage of justice.

*By the Court.*—Judgment affirmed.

The following memorandum was filed on June 29, 1973.

PER CURIAM *(on motion for rehearing).* The appellant's rehearing brief points out that the opinion indicates that the appellant did not preserve his claimed error in the jury instructions by failure to object to the instructions as given. This part of the opinion is in error and is withdrawn. The appellant did submit written requested instructions which the trial court rejected. He need not further object and his claim of error is preserved. However, in this case we have determined the instructions were proper and therefore no reversible error obtains.

Rehearing denied without costs.