Ralph McCLAIN, Plaintiff,

v.

UNITED STATES, Defendant.

No. 76–C–718.

United States District Court,
E. D. Wisconsin.

June 10, 1980.

Shapiro, Gorsky & Dubin by Carl L. Dubin and Timothy J. Strattner, Milwaukee, Wis., for plaintiff.

Joan F. Kessler, U. S. Atty. by James M. Fergal, Asst. U. S. Atty., Milwaukee, Wis., for defendant.

### DECISION and ORDER

MYRON L. GORDON, District Judge.

This is an action for damages brought under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b) and 2671–2680. A three day bench trial limited to the issue of liability was held in April 1980, and both sides have submitted post-trial briefs. This memorandum constitutes the court's findings of fact and conclusions of law pursuant to Rule 52(a), Federal Rules of Civil Procedure.

Many of the facts have been stipulated. Complaining of pain in his right hip, the plaintiff entered the Veterans Administration hospital at Wood, Wisconsin, as an outpatient on May 25, 1973; X-rays were taken of Mr. McClain's pelvis, hips and lumbar (lower) spine. He was then admitted as an inpatient on June 1, 1973, at which time he was tentatively diagnosed as suffering from ankylosing spondylitis and diabetes.

In an effort to diagnose the causes of Mr. McClain's pain, a lumbar myelogram was attempted at the Veterans Administration hospital by Dr. Van Dyke on June 15, 1973. This procedure was aborted, however, because ossification and calcification caused by the ankylosing spondylitis prevented the passage of the needle into the area of Mr. McClain's lumbar spine.

Due to the failure of the lumbar myelogram, a different diagnostic procedure, a cisternal puncture, cervical air myelogram was performed on June 21, 1973, by Dr. Kim, a staff neuroradiologist. Sometime during this procedure, Mr. McClain sustained a brain stem injury and was thereafter found by the Veterans Administration to be one hundred percent totally and permanently disabled.

The plaintiff contends that the cisternal puncture procedure was performed negligently, causing his brain stem injury; he also charges that the procedure was performed without his informed consent. The government asserts that the work was performed with due care and that Mr. McClain's consent had been obtained. The defendant also maintains that the plaintiff's brain stem injury was caused by a spontaneous stroke, not causally related to the cisternal puncture procedure.

It is undisputed that Mr. McClain sustained a brain stem injury on June 21, 1973; the expert witnesses for both sides testified that a lesion in the pons or mid-brain had occurred. Although this procedure involves risk, it is clear that if the procedure had been carefully performed, it should not have caused Mr. McClain's brain stem injury. Therefore, the basic issue in this case is whether Mr. McClain has proved by a pre-

ponderance of the evidence that it was a negligently performed cisternal puncture procedure which caused his brain stem injury. Since I find that Mr. McClain has met that burden, I need not decide whether he gave his informed consent to the performance of the procedure.

The cisternal puncture, cervical air myelogram is performed in two stages. In stage one, a needle, between three and a half to four and a half inches in length, is inserted from the back of the neck into the cisterna magna subarachnoid space. After the needle is inserted in the cisterna magna, cerebral spinal fluid is withdrawn and air or oxygen is injected incrementally. In stage two, after the needle is withdrawn and the air is caused to move through the spinal canal to the patient's lumbar spine by elevating the lower half of the body and lowering the upper half, X-rays are then taken of the lumbar spine. The air serves as a "contrast medium," enabling the radiologist to detect the presence and location of any tumors or other disorders. The diagnostic tools of the procedure include the lumbar X-rays and laboratory analysis of the cerebral spinal fluid.

One of the known risks associated with the cisternal puncture procedure is that the needle may pass through the cisterna magna and penetrate the brain stem, which lies just a few millimeters beyond the cisterna magna. This can occur if the patient moves suddenly while the needle is in place in the cisterna magna, if the needle initially is inserted too far, or if the doctor performing the procedure moves the needle after it is correctly placed in the cisterna magna. If the needle passes through the cisterna magna and becomes lodged in the brain stem, it will not be possible to withdraw cerebral spinal fluid, and certain critical respiratory and cardiac functions controlled by the brain stem may be interrupted.

In the instant case, relevant portions of the hospital record, consisting of doctors' progress notes and hospital narrative summaries, indicate that the needle was correctly placed in the cisterna magna but that, sometime during the procedure, a le-sion occurred in Mr. McClain's brain stem. Dr. Kim's progress note states that the first half of the procedure was uncomplicated; cervical spinal fluid was withdrawn and oxygen was insufflated. Based on information obtained from Dr. Kim, Drs. Steinlieb and Van Dyke noted that Mr. McClain had described a bubbling sensation near his ear, which, according to Dr. Kim, meant that the oxygen had been properly injected into the cisterna magna. The hospital records do not include a laboratory analysis of the cerebral spinal fluid which Dr. Kim reported withdrawing, although this analysis was one of the objectives of the procedure. In fact, there is no record that the fluid was kept after the procedure.

The notes and summaries then indicate that, between fifteen minutes and an hour after the needle was removed, Mr. McClain developed a severe headache, nausea and vomitting, high blood pressure, and lowered pulse and respiratory rates. Immediately after demerol was administered for the plaintiff's headache, Mr. McClain became rigid and unresponsive, or "decerebrate," and remained in this state over the next twenty-four to forty-eight hours.

Both of the plaintiff's medical experts testified that these symptoms demonstrated that Mr. McClain sustained a brain stem injury sometime during the procedure. Both testified that the respiratory and cardiac symptomatology indicated an injury to the medulla obligata, the lower portion of the brain stem, and that the decerebrate rigidity showed an injury to the pons, the middle portion of the brain stem, located just above the medulla.

One of the plaintiff's experts, Dr. Leestma, a board-certified neuropathologist, testified that he was certain that the needle penetrated the medulla and possibly also the pons. He testified that a lesion of the pons could occur even if the needle penetrated the medulla but not the pons, because the medullary injury could be "transferred" upward into the pons by bleeding, edema, progressive necrosis or destruction of tissue.

The plaintiff's other expert, Dr. Gruesen, is a neurosurgeon who is board eligible but not board certified. He was Mr. McClain's treating physician for a year after Mr. McClain was released from the hospital. He testified that he was certain that it was the cisternal puncture procedure which caused hemorrhaging in Mr. McClain's brain stem, specifically, in the upper medulla and pons. He declined, however, to state categorically that the needle penetrated either the medulla or the pons. He stated that the specific mechanism of injury could only be revealed by an autopsy. He agreed that the medulla might have been penetrated and that this injury could have propagated upward to the pons, but he stated that there were other possibilities, such as the puncture of a blood vessel in the cisterna magna causing an infarct in the medulla and pons.

The government's medical expert Dr. Larson, a board-certified neurosurgeon, testified that it was impossible for the needle to have reached the pons. He noted, however, as did the plaintiff's medical experts, that Mr. McClain's decerebrate state clearly indicated a lesion to the pons. He also testified that, if the medulla had been penetrated and the injury had propagated upward to the pons, the medulla would have been so badly damaged that it would not have been capable of communicating the decerebrate rigidity from the pons to Mr. McClain's torso and limbs; rather, Mr. McClain would have become loose and flaccid—just the opposite of rigid—had there been a severe injury to the medulla. He therefore ruled out the possibility that a medullary injury propagated to the pons, and, since he believed the needle could not have reached the pons, he concluded that the lesion to the pons was not causally related to the cisternal puncture procedure. His theory was that the lesion was caused by a spontaneous stroke.

Not only do I find the plaintiff's experts' explanation of the cause of Mr. McClain's brain stem injury more reasonable and persuasive than that of the government's witnesses, but I also find several flaws in Dr. Larson's conclusions. First, even if one were to concede that the needle could not have reached the pons, it is not at all clear that a medullary injury would have to destroy totally the medulla as the injury moved upward to the pons. The medulla and the pons are contiguous portions of the brain stem; it is possible that the needle penetrated the upper portion of the medulla (where Dr. Gruesen localized the lesion), within one or two millimeters of the pons, and that the injury then propagated upward to the pons without causing serious harm to the medulla. Second, although Dr. Larson assumed that the lesion to the pons must have been very severe for the decerebrate rigidity to have occurred, from which he concluded that a medullary injury propagating upward would have also seriously damaged the medulla, Dr. Leestma testified that there is no conclusive data available on how severely the pons must be injured before the state of decerebrate rigidity results.

In addition, Dr. Gruesen testified that it is not known precisely how much of the medulla is needed to communicate the lesion in the pons to the body. Thus it is possible that the medulla *was* severely damaged as the injury propagated upward, notwithstanding the occurrence of decerebrate rigidity. Moreover, Dr. Larson failed to account for the symptoms which Mr. McClain displayed, namely, cardiac and respiratory arrest, which the plaintiff's experts testified clearly demonstrated a medullary injury. Rather, Dr. Larson seemed to assume that a medullary lesion would only express itself in flaccidity; however, there is no evidence to warrant the conclusion that a medullary injury will cause flaccidity only.

In sum, I find a preponderance of the evidence in support of the plaintiff's analysis that the needle penetrated the upper medulla causing an injury to the medulla which then propagated upward into the pons. I adopt the conclusions of the plaintiff's experts not only because I find their theories inherently more persuasive than Dr. Larson's, but also because I find their testimony more closely attuned to the actu-

al symptoms Mr. McClain displayed during and after the cisternal puncture procedure. The reasons which the government has advanced as to why Dr. Larson's testimony should be given more weight than the testimony of Drs. Leestma and Gruesen are, in my opinion, unconvincing.

I believe that the testimony shows that no definitive conclusion can be drawn from either the lapse of time between the removal of the needle and the onset of Mr. McClain's adverse symptoms or from the fact that the arteriograms taken soon after Mr. McClain became decerebrate were normal. The same is true with respect to Dr. Kim's testimony that he withdrew clear cerebral spinal fluid during the first stage of the procedure; Drs. Leestma and Gruesen testified that a puncture of the medulla would not necessarily cause bleeding into the cisterna magna and that, even if bleeding did occur, the blood might not be withdrawn along with the cerebral spinal fluid. It is also possible that the medullary penetration occurred after the cerebral spinal fluid was withdrawn.

The bubbling sensation which Mr. McClain described also does not preclude a finding that the medulla was penetrated since the puncture may have occurred before or after the oxygen was injected. The government's position that oxygen was properly injected into the cisterna magna is contradicted to some extent by the seven tomograms (X-rays) of Mr. McClain's lumbar spine which were taken in the second stage of the procedure, before Mr. McClain became rigid and unresponsive. At the trial Dr. Kim purported to see air in one of the films, but prior to trial he stated that he could not see air in any of the films; Dr. Larson also found air in the same film. However, Dr. Gruesen testified that he did not see air in any of the films, as did Dr. Comny, a diagnostic radiologist who the plaintiff called to the stand simply to interpret the disputed tomogram.

Was the procedure performed negligently? From all the evidence, I conclude that the defendant's agents failed "to exercise that degree of care and skill which is exercised by the average practitioner" in the class to which they belong, acting in the same or similar circumstances. *Shier v. Freedman*, 58 Wis.2d 269, 283, 206 N.W.2d 166, 174 (1973). Was such negligence a proximate cause of the injury? All the doctors who testified in this case agree that Mr. McClain displayed clear symptoms of a brain stem injury within minutes after a needle was placed only a few millimeters away from the area of injury. I believe the plaintiff's witnesses have supplied the more convincing explanation of the cause of the injury. Moreover, I believe that the government has failed to undermine the soundness of this explanation and also has failed to advance a satisfactory alternative explanation.

Therefore, IT IS ORDERED that the defendant be and hereby is found liable for negligently causing the brain stem injury the plaintiff suffered during the performance of the cisternal puncture cervical air myelogram on June 21, 1973.

IT IS ALSO ORDERED that a pretrial conference will be held on Monday, July 21, 1980, at 9:45 A.M. for the purpose of scheduling the resolution of the issue of damages.